## MARINE RAILWAY & COAL COMPANY, INC. *v.* UNITED STATES.

### ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 45. Argued October 18, 1921.—Decided November 7, 1921.

1. The jurisdiction of this court to review judgments of the Court of Appeals of the District of Columbia "in cases in which the jurisdiction of the trial court is in issue" (Jud. Code, § 250, cl. 1), attaches to a case originating in the Supreme Court of the District in which the issue concerned the territorial limits of that court's jurisdiction. P. 62.

2. The Supreme Court of the District of Columbia being a court of general jurisdiction, there is no occasion to limit the natural scope of Jud. Code, § 250, cl. 1, after the manner in which the similarly worded § 238, applicable to the District Courts of the United States, has been confined to cases in which their jurisdiction as federal courts is involved. P. 62.

3. A certificate of the question of jurisdiction is not necessary, under Jud. Code, § 250, *supra*, where the issue was clearly made by plea and a certificate could add nothing to the record. P. 62.

4. *Quære:* Whether the rule construing the sixth clause of Jud. Code, § 250, as conferring jurisdiction only when the law drawn in question is of general application throughout the United States, as distinguished from one local to the District, would apply in a case involving a statute fixing the boundary of the District. P. 62. Cf. *American Security & Trust Co.* v. *District of Columbia,* 224 U. S. 491.

5. The original title of Maryland, to which the United States succeeded in the District of Columbia, extended at least to the low water mark on the Virginia side of the Potomac River. P. 63.

See *Maryland* v. *West Virginia,* 217 U. S. 1, 45, 46; *id.* 577, 578; and *Morris* v. *United States,* 174 U. S. 196.

6. The Maryland title was not affected by later charters granted by James I to Virginia.  P. 63.

7. A grant made by the Governor of Virginia to one Howsing in 1669, with a boundary "extending down Potomack River by various courses 3152 po. making a S. Wtly line to a pokecory," etc., and "including several small creeks or inlets," *held* consistent with as well as subordinate to the Maryland grant, merely following the line of the stream and not intended to include an indentation or cove.  P. 63.

8. The grant made by Virginia to the United States of territory formerly included in the District of Columbia and its re-grant by the United States did not enlarge Virginia's rights as they were originally.  P. 63.

9. The compact entered into between Virginia and Maryland, in 1785, to regulate commerce, which provided, *inter alia,* that the Potomac should be a common highway for purposes of navigation and commerce to the citizens of both States and gave the citizens of each full property in the shores of the river adjoining their lands with wharfing and fishing rights, did not settle the question of boundary between the States.  P. 63.

10. The arbitration of boundary between Virginia and Maryland, the award in which was accepted by those States in 1878 and assented to by the United States (Act of March 3, 1879, c. 196, 20 Stat. 481,) fixing the line at low water mark on the Virginia side of the Potomac drawn from headland to headland, did not involve or affect the boundary as between Virginia and the District of Columbia.  P. 64.

11. The filling in and adverse occupation of land originally below low water mark on the Virginia side of the Potomac under an erroneous claim that the Virginia line included a cove in which the land was situated by extending frcm headland to headland, gave no prescriptive right, as against Maryland or the United States, to land lying in the cove, and below low water next to the areas so filled, even though the claim was supported by Virginia statutes.  P. 65.

12. The description of the District of Columbia in the Revised Statutes relating thereto, June 22, 1874, § 1, as "including the river Potomac in its course through the District," imports an assertion by Congress that the title of the United States embraces the whole river; and the jurisdiction of the District over the river seems to have been exercised without dispute.  P. 65.

13. The United States is entitled to the possession of land in the District which it has reclaimed by filling below low water line on the Virginia side, though access to the water from private lands adjacent be thereby interrupted. P. 66.

49 App. D. C. 285; 265 Fed. 437, affirmed.

ERROR to review a judgment of the Court of Appeals of the District of Columbia which affirmed a judgment of the Supreme Court of the District in favor of the United States in a suit brought by the United States to recover a strip of made land on the Potomac River.

*Mr. James R. Caton* for plaintiff in error.

In *Maryland* v. *West Virginia,* 217 U. S. 1, 517, this court recognized that the arbitration and award established the boundary line between Virginia and Maryland, to be the *true* boundary line between said States, agreeably to the Compact of 1785. And see *Wharton* v. *Wise,* 153 U. S. 155, 172, 173.

The claim of the plaintiff in error not being founded on the Culpeper grant, is distinguished from *Morris* v. *United States,* 174 U. S. 196. There was no evidence in that case of any substantial claim by Lord Fairfax, or by his grantees, to property rights in the Potomac River or the soil thereunder; nor was there any evidence that Virginia ever exercised the power to grant ownership in the islands or soil under the river to private persons. In this case, the Howsing grant of 1669, and its history, show that Virginia claimed the right and exercised the power, and has for 243 years, and up to the time of this suit, consistently and continuously claimed and exercised territorial dominion and jurisdiction.

The true boundary between Maryland and Virginia in 1785, and for a long time prior thereto, on the Virginia side of the Potomac, was a uniform line at low-water mark from one headland to low-water mark at another,

without following indentations, bays, creeks, etc.; and to this line Virginia had become entitled as early as 1785 by prescriptive right, and it was fixed and established by the Compact of 1785, all of which appears from the report and award of the arbitrators selected under agreement by Maryland and Virginia, and the subsequent acceptance thereof by the acts of assembly of both States and the consent thereto by Congress.

The grants by James I to Virginia do not appear to have been in evidence, or even considered, in *Morris* v. *United States, supra.* Out of these conflicting grants there arose a lengthy controversy between Maryland and Virginia,—Maryland claiming by virtue of the charter of Charles I to Lord Baltimore the whole of the Potomac to high-water mark on the Virginia side, and Virginia claiming by virtue of the charters of James I and by prescription to high-water on the Maryland side, Virginia insisting that the boundaries of the territory under the grant to Lord Baltimore extended only to high-water mark on the Maryland side. During the 150 years or more this controversy continued, Virginia always asserted territorial jurisdiction, ownership and possession of the shores or strands on the Virginia side, which is evidenced by the grant of land to include the soil under the waters on the Virginia side of the river to Howsing, in 1669, which was prior to the grant of James I, in 1688, to Lord Culpeper. See *Maryland* v. *West Virginia,* 217 U. S. 1, 45; s. c. 217 U. S. 577–581.

The Act of Congress of 1874, defining the political boundaries of the District of Columbia, does not alter the boundary line between Virginia and the District, as set forth in the arbitration and award of 1878; according to the true interpretation of the act, it serves only to confirm the contention of plaintiff in error.

Although that act is a political declaration of the boundaries of the District, yet, when the United States

comes into a court of law and sues to recover the fee of a parcel of land claimed by it to be within the boundaries of the District, and that fact is put in issue by plea to the jurisdiction, it is bound to establish that fact, and the case must be tried on the law and the facts of the case.

Battery Cove, which includes the land in controversy, is no part of the course or of the navigable body of the river.

In the Howsing grant it is expressly stated that the line is a southwesterly line from Alexander's Island to Jones' Point, which is a straight line. The presumption is that a line between monuments is a straight one. This is not overcome by the fact that monuments are at points on the same river. *Slade* v. *Etheridge,* 13 Ired. Law, 553.

The Howsing grant, the legislation of the Colony and State of Virginia, from 1753 to 1789, and from 1846 to 1912, the making of land by Virginia and her citizens into the Potomac all along the Alexandria river front, covering a distance of two blocks east of the shore line of 1748, making 14 city blocks and including streets containing an area of about 35 acres, sustain the prescriptive claim of territorial sovereignty and jurisdiction in Virginia.

Possession under the Howsing grant of a part of the land comprehended within its boundaries, constitutes possession of the whole; especially is this true where acts of possession and claim of ownership under the grant, and the exercise of sovereignty and jurisdiction by the State and city, have continued for so long a period. Taxes have been imposed and collected thereon by both Virginia and Alexandria during all that period, except between the cession and recession of the Virginia territory. All titles to property within the lines of the Howsing grant in Alexandria City and County, including Alexander's Island and Pearson's Island, and to the made lands on the Alexandria river front, are recorded in Virginia. *Jackson* v. *Camp,* 1 Cowp. 605, 612. This constructive possession has its origin in the maxim of the common law that " possession

of a part shall be construed as possession of the whole." *Garrett* v. *Ramsey*, 26 W. Va. 345, 351; *Lowndes* v. *Huntington*, 153 U. S. 1, 32.

Sovereignties may lose territory by prescription as individuals may lose their title by adverse possession. *Rhode Island* v. *Massachusetts*, 4 How. 591, 639; Vattel, Law of Nations, bk. 2, c. 11, § 149. The constant and approved practice of nations shows that, by whatever name it be called, the uninterrupted possession of territory for a certain length of time by one State excludes the claim of every other. Wheaton, Int. Law, pt. 2, c. 14, § 164; *Indiana* v. *Kentucky*, 136 U. S. 479; *Virginia* v. *Tennessee*, 148 U. S. 503, 523, 524; *Maryland* v. *West Virginia*, 217 U. S. 1, 577, 585; *Phillips* v. *Payne*, 92 U. S. 130.

The Act of Congress of June 25, 1910, read with related legislative documents, clearly recognizes the territorial rights and jurisdiction of Virginia over the whole line of the authorized improvement along the Alexandria river front from Jones' Point to the northern corporate limits of said city.

If the contention that the original line of the Calvert grant of 1632 is the present boundary between the District and Alexandria were upheld, it would cut off Alexandria entirely from the river and place in the District all the land made in the coves prior to 1785, covering a large number of city blocks, and would disturb the title of their owners.

Whilst Alexandria was a part of the District of Columbia, Congress preserved the integrity of the territorial and jurisdictional limits of Alexandria, and since the recession neither the United States nor the District has made any claim to the territory within these lines or exercised any act of jurisdiction over the same during the 67 years previous to the time Battery Cove was filled.

After the lapse of time between the date of the Howsing grant and the present, the presumption of law is in

favor of the validity of that grant. *Fletcher* v. *Fuller,* 120 U. S. 534; *Cariño* v. *Insular Government,* 212 U. S. 449; *Costas* v. *Insular Government,* 221 U. S. 623; *Matthews* v. *Burton,* 17 Gratt. 312; 32 Cyc. 1202. An original grant carries with it constructive or legal possession of the whole area covered by the grant. *Dawson* v. *Watkins,* 2 Rob. (Va.) 259, 268; *Green* v. *Liter,* 8 Cr. 229; *Green* v. *Watkins,* 7 Wheat. 27; *Howdashall* v. *Crenning,* 103 Va. 30.

There is no evidence showing that either Maryland or the United States ever made any claim to Alexander's Island or Pearson's Island, or any of the bays, creeks or inlets, included in the Howsing grant.

The Compact of 1785 was a complete and binding agreement between Maryland and Virginia, and their respective territorial rights thereunder had become fixed before the formation of the Federal Government and the adoption of the Federal Constitution. *Wharton* v. *Wise,* 153 U. S. 155, 166; *Virginia* v. *Tennessee,* 148 U. S. 503, 521.

The compact confirmed the territorial ownership and jurisdiction of Virginia. The acts of cession of these States did not modify the compact in so far as it fixed the territorial boundaries and jurisdiction of Virginia. *Georgetown* v. *Alexandria Canal Co.,* 12 Pet. 91.

The riparian right of making wharves and other river improvements is property, subject only to the power of Congress under the commerce clause, and can then be interfered with only when necessary to promote navigation. *Illinois Central R. R. Co.* v. *Illinois,* 146 U. S. 387; *Yates* v. *Milwaukee,* 10 Wall. 497, 504.

The right of a riparian owner is not a mere license, or privilege, but is property in the soil up to the line of navigation, though covered by water. *Norfolk* v. *Cook,* 27 Gratt. 430, 434, 435; *Railroad Co.* v. *Schurmeir,* 7 Wall. 272, 290; *Dutton* v. *Strong,* 1 Black, 1, 29; *Grover* v. *Foster,* 96 Va. 650; *Peck* v. *Hampton,* 115 Va. 855.

The United States did not acquire title to or jurisdiction over the filled area because of the fact that in the improvement of the river and harbor it made and reclaimed the land. *Illinois Central R. R. Co.* v. *Illinois,* 146 U. S. 387.

By the act of Congress approving and consenting to the agreement and award, the United States became a party thereto as fully and as effectually as if it had been a party at the very inception of the agreement to submit to arbitration. *Wharton* v. *Wise,* 153 U. S. 155, 172, 173; *Virginia* v. *Tennessee,* 148 U. S. 503, 521. The reservation in the act consenting to the arbitration and award, of jurisdiction over the waters and islands, referred only to the powers of Congress over the waters and islands under the commerce clause of the Constitution. The reservation does not relate to territorial or property rights, but to jurisdiction only.


*Mr. Henry H. Glassie,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Frierson* and *Mr. Leslie C. Garnett,* Special Assistant to the Attorney General, were on the brief, for the United States.

The United States, as successor to the lord proprietary of Maryland and as complete territorial sovereign of the District of Columbia, has not only the dominion but the absolute property of the soil of the Potomac River. Any land, therefore, raised upon the submerged bed in the course of a lawful public improvement, is owned in absolute property by the United States. Hale, De Jure Maris, c. 6; *Shively* v. *Bowlby,* 152 U. S. 1, 48; *Austin* v. *Rutland R. R. Co.,* 45 Vt. 215, 244; *Hoboken* v. *Pennsylvania R. R. Co.,* 124 U. S. 656, 690.

It is settled that the Maryland Charter of 1632 embraced the Potomac River and the soil under it to high-water mark on the Virginia bank. *Morris* v. *United*

*States,* 174 U. S. 196, 225; *Alexandria Canal Co.* v. *District of Columbia,* 1 Mackey, 257. It is true that the Marshall claim rejected in the *Morris Case* was based upon the Culpeper grant of 1688, whereas the claim here is based on the Howsing grant of 1669. But the Culpeper grant was a confirmation of the original grant to Hopton of September 18, 1649, confirmed to his successors on May 8, 1669 (4 Hen. Stat. Va., c. XVIII, pp. 514, 519). In holding that the Maryland title was "not affected by the subsequent grant to Culpeper" the court held in effect that it was superior to the original Hopton grant which was itself senior to Howsing.

The Howsing grant embraced no part of the Potomac River: (a) Because it was an ordinary conveyance, under a general system for the disposition of unappropriated lands, which even by Virginia law carried no soil under public tidal waters. *Home* v. *Richards,* 4 Call (Va.) 441, 446, 447; *Mann* v. *Tacoma Land Co.,* 153 U. S. 273, 284. (b) Because, the Governor of Virginia being without power to enlarge the political boundaries of the colony, the grant must be construed as confined to land in Virginia. (c) Because the description, beginning on land and "extending down the Potomack River various courses 3152 poles," does not call for straight lines in the river. *Brown* v. *Huger,* 21 How. 305, 320; *Hardin* v. *Jordan,* 140 U. S. 371, 380; *Smith* v. *Aldridge,* 2 Hayw. 382; *Rogers* v. *Mabe,* 15 N. Car. 180, 184. The river being public, the grant stops at the water's edge, notwithstanding the words "including several small creekes or inlets for the said quantity." The last expression means only that the quantity had been measured approximately without allowance for small water areas within the tract.

While some so-called islands now forming part of the Virginia mainland were taken possession of under the Howsing grant, no part of the *locus,* which remained submerged until the improvement, was ever in the possession

of the grantees. Constructive adverse possession under color of title—itself a mere legal fiction, *Carey* v. *Cagney*, 109 La. 77, 82—has no application to lands not susceptible of possession in the ordinary sense. *Chandler* v. *Spear*, 22 Vt. 388, 404; *Paine* v. *Hutchins*, 49 Vt. 314, 318; *Bailey* v. *Carleton*, 12 N. H. 9; *Thompson* v. *Barhans*, 61 N. Y. 52, 68. Nor to land which the grantor is incapable to convey. *Proctor* v. *Railroad*, 100 Me. 27, 29; *Roberts* v. *Baumgarten*, 110 N. Y. 80, 83. Hence not to land covered by water, which is not only *publici juris* but lies over the frontier in the territory of an independent sovereignty. *Hoye* v. *Swann*, 5 Md. 237, 249; *Casey* v. *Inloes*, 1 Gill. 497, 500. In the absence of occupancy, the seizin remains in him who has the title. *Hunnicutt* v. *Peyton*, 102 U. S. 333, 368. The Maryland proprietary was not bound to notice domestic conveyances in Virginia. Nor would possession of upland under such conveyances indicate that the patentees claimed soil under the river, patentable neither in Virginia nor in Maryland.

The Maryland-Virginia Compact of 1785 was without effect on the Potomac boundary.

The purpose was not to change the charter line but to make provision for the concurrent use and police of the waters. Proc. Md. Conv. 1774–1776, pp. 291, 293. *Attorney General* v. *Del. & B. B. R. R. Co.*, 27 N. J. Eq. 1, 121; *Nicoulin* v. *O'Brien*, 248 U. S. 113, 114; *Wedding* v. *Meyler*, 192 U. S. 573, 584.

The shore and wharf rights allowed the Virginia upland owners, being consistent with continued ownership in Maryland, did not involve alteration in the line.

The compact was not regarded by the parties as having determined the boundary. This is established: (a) By the repeated efforts subsequently made to secure a settlement. Laws Md. 1831, Res. No. 128; 1833, Res. No. 80; 1834, Res. No. 99. (b) By Virginia's claiming, as late as 1872, the whole river to the north bank. Report and Accom-

panying Documents of Virginia Commissioners appointed to ascertain the Boundary Line between Maryland and Virginia. Rich. 1873, p. 3, Append. B, p. 86.

No reason exists for giving the compact the effect suggested. Shore lines are physical, not imaginary lines. A boundary from headland to headland is highly inconvenient in practice and inconsistent with dominion of the river, as such, which unquestionably belonged to Maryland. Hall, Int. Law, 7th ed., p. 125; 1 Moore, Int. Law Digest, p. 617; Grotius, De Jur. Bell. et Pac., Lib. II, c. 3.

Construing the compact as a treaty between two sovereign States (*Howard* v. *Ingersoll*, 13 How. 381, 412), the privileges in the waters and adjacent shores are no more than a recognition of servitudes in the stream generally allowed in favor of the subjects of the opposite sovereign. *The Apollon*, 9 Wheat. 362, 369; Wheaton, Int. Law, §§ 193, 194; Kaeckenbeck, International Rivers, 15, 34, 74, 134, 184. The cession of a right of user, for whatsoever purpose, cannot be deemed a surrender either of the basic right of property or of territorial sovereignty. Rivier, Droit des Gens, t. I., p. 296; Vattel, bk. I, c. 22, § 273.

The compact, being made between Virginia and Maryland in their character as States, was subject to alteration by their joint will. *Georgetown* v. *Alexandria Canal Co.*, 12 Pet. 91, 96; Opphenheim, Int. Law, vol. I, §§ 204, 520. It was, therefore, abrogated by the vesting of this absolute power in a single sovereign, when the two States ceded to the United States the original District, including the whole of the river, its bed, and the shores on both sides. *Evans* v. *United States*, 31 App. D. C. 550. The principle of *consolidatio* is recognized as applicable to international servitudes. Calvo, Droit Int. I, p. 33; Heffter, Droit Int. (traduc-francaise), § 43, p. 93. The retrocession to Virginia (Act of July 9, 1846, c. 35, 9 Stat. 35) making no mention of them, the merged

easements and privileges were not revived. *Evans* v. *United States,* 31 App. D. C. 544, 552; *Capron* v. *Greenway,* 74 Md. 289, 293; *Denton* v. *Leddell,* 23 N. J. Eq. 64, 66; *Rogers* v. *Powers,* 204 Mass. 262, 264; *Greenwood* v. *Metropolitan Elevated R. R. Co.,* 12 N. Y. S. 919; Pardessus, Traité des Servitudes, §§ 16, 296, 299.

The arbitration award of 1877, being limited to the boundary between Virginia and Maryland, was without effect on the Virginia-District of Columbia boundary. Nor did the Act of March 2, 1879, 20 Stat. 481, giving the consent of Congress to the award, make it applicable to the Virginia-District of Columbia boundary, notwithstanding the proviso, inserted out of abundant caution, that nothing therein contained should impair or affect any right or jurisdiction of the United States over the islands and waters forming the subject of such award. *In re Devoe Manufacturing Co.,* 108 U. S. 401, 415.

*Maryland* v. *West Virginia,* 217 U. S. 1, 577, is not an authority on the Potomac boundary. The real question there was the western, not the river boundary. The court's attention was not directed to the question of high or low water mark. The suggestion in the supplementary opinion (217 U. S. 580) that the privileges on the shores were inconsistent with the charter boundary was grounded on a tacit concession, for Maryland after the award of 1877 had never pressed a claim to high water mark. The expression of opinion is not binding. *The Genessee Chief,* 12 How. 443, 455.

The headland to headland theory has no possible application to an interstate river boundary. It is not recognized by the United States as a general principle even in maritime boundaries. 1 Moore, International Law Dig., 719. The line cannot be drawn across the ordinary indentations and sinuosities of the shore. *Direct United States Cable Co.* v. *Anglo-American Tel. Co.,* L. R., 2 A. C. 394, 418. Maritime boundaries are drawn from

headland to headland only when they mark the entrance to a landlocked estuary or bay. 1 Moore, Int. Law, Dig., pp. 703, 704, 741; 1 Ops. Atty. Gen. 32; *Stetson v. United States,* 32 Alb. Law Journ. 484; 4 Moore, Int. Arb. 4332–41. The present points claimed as headlands cannot be taken because they have been artificially created. The old, obliterated points some distance inland cannot be taken because, if ever headlands, they are such no longer. A headland call requires a definite, permanent, visible object. The claim for a headland line is an attempt to apply the Maryland-Virginia arbitration line of 1877, reached upon the erroneous assumption that boundary is determined by the extent of the wharfing privileges.

Domestic statutes of Virginia authorizing extensions of Alexandria into the river do not make a new interstate boundary. Acquiescence cannot be inferred from Maryland's failure, during the Revolutionary period, to prevent such fillings. The land so made may be treated as an accomplished fact. *Indiana v. Kentucky,* 136 U. S. 479, 510. But failure to prevent by force particular encroachments cannot be treated, in the face of Maryland's denial, as an acknowledgment of a general right to make them. It is the fact of occupancy, not the claim, which works the change. *Arkansas v. Tennessee,* 246 U. S. 158, 172. Between 1791 and 1847 the United States was sovereign of both shores, and changes in the water front then made cannot affect the question because there was then no boundary to affect. Virginia statutes passed after the retrocession are merely paper claims of jurisdiction not acquiesced in by the United States. Congress, on the contrary, has expressly defined the District, and governed it, as the territory ceded by Maryland, "including the river Potomac in its course through the District, and the islands therein." Rev. Stats. D. C. § 1. In such a conflict the legal title must prevail. *United States v. Texas,* 162 U. S. 1, 88.

Virginia has not shown such long continued possession of, or exercise of dominion over, the disputed area as would be equivalent to the relocation of a common boundary line by acquiescence. Calls of private conveyances for lines running " into the river," etc., do not constitute adverse occupation of the bed of a public river. The United States had all the possession of which such soil was susceptible. Such actual jurisdiction as has been exercised has been in accordance with the Government's claim: By police of the waters and protection of the fisheries. Act April 6, 1880, 21 Stat. 71; Act March 2, 1885, 23 Stat. 340. By taxation of physical objects affixed to the soil of the bed. Acts of February 5, 1808, 2 Stat. 457; July 14, 1832, 4 Stat. 502; June 30, 1834, 4 Stat. 727; July 27, 1868, 15 Stat. 231; June 21, 1886, 24 Stat. 84; July 18, 1888, 25 Stat. 314. By the execution of process and the enforcement of the District excise laws on boats even while in the slips at Alexandria.

The title of the United States, like the Crown title in tidal rivers in England, is an absolute right of property in the soil. *Rex* v. *Parmenter,* 10 Price, 378, 409. Hence, the Government being the owner of the fee of the soil while submerged, remains the owner of the fee of the soil reclaimed. *Shively* v. *Bowlby,* 152 U. S. 1, 11; *Barney* v. *Keokuk,* 94 U. S. 324; *Haight* v. *Keokuk,* 4 Ia. 199; *Tomlin* v. *Dubuque R. R. Co.,* 32 Ia. 106; *Hoboken* v. *Pennsylvania R. R. Co.,* 124 U. S. 656; *Stevens* v. *Paterson & N. R. R. Co.,* 34 N. J. L. 532.

No riparian rights annexed to the Virginia upland could preclude the United States from intercepting such upland by a seawall. *Gibson* v. *United States,* 166 U. S. 269; *Scranton* v. *Wheeler,* 179 U. S. 141. Riparian rights, being subject to the obligation to suffer the consequences of all lawful operations in the stream (*Jackson* v. *United States,* 230 U. S. 1, 21; *Darling* v. *Newport News,* 249 U. S. 540, 543) are enjoyed in subordination to the power

to confine the channel by a seawall and to deposit the material dredged out of the channel behind such wall. *Sage* v. *Mayor,* 154 N. Y. 61, 76; *Home* v. *Commonwealth,* 202 Mass. 422, 429; *Scranton* v. *Wheeler,* 179 U. S. 141, 169.

But conceding that defendant's riparian rights were infringed by the reclamation, that fact would not invest defendant with title to the reclaimed area. An owner of land having a statutory right to wharf out acquires no title to reclamation on submerged soil in front of him, even when made by a stranger. *Austin* v. *Rutland R. R. Co.,* 45 Vt. 215, 242; *Coburn* v. *Ames,* 52 Cal. 385, 398. Much less, when made by the sovereign itself. No economic reason exists for giving the reclaimed soil to the upland owner even if wrongfully deprived of access, since reclaimed soil is not a proper measure of compensation. The shore land having the least valuable riparian rights would, in that event, acquire the major portion of the reclamation.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a suit brought by the United States in the Supreme Court of the District of Columbia to recover possession of a strip of land on the Potomac River front of the City of Alexandria. Except an insignificant portion as to which no special defence was made and which it is agreed may be disregarded, this strip lay below low water mark until it was filled in by the United States in 1910–1912 by dredging from the bottom of the river and depositing the material on the other side of a riprap wall built on the river bed. Act of June 25, 1910, c. 382, 36 Stat. 630, 639. Act of February 27, 1911, c. 166, 36 Stat. 933, 937. The United States enclosed the made land by a fence at high water mark, but the defendant, the plaintiff in error, claiming title to the adjoining land inshore, destroyed the fence and took possession, whereupon this

action was brought. The defendant pleaded to the jurisdiction of the Court alleging that the land was not in the District but was part of Virginia. On this issue the Court found or ruled in favor of the plaintiff and afterwards did the same upon the general issue, a jury having been waived. Judgment for the plaintiff was affirmed by the Court of Appeals and the defendant took a writ of error to bring the case to this Court.

A question is raised by the defendant in error as to the jurisdiction of this Court. The language of the Judicial Code, Act of March 3, 1911, c. 231, § 250, 36 Stat. 1087, 1159, is that any final judgment of the Court of Appeals may be reëxamined " First. In cases in which the jurisdiction of the trial court is in issue." The words taken literally cover this case, but it is argued that they should be construed as similar words in § 238 concerning the District Courts are construed. In the latter instance, as is well known, they are confined to the jurisdiction of the District Courts as courts of the United States. But the jurisdiction of the District Courts is a limited jurisdiction based upon statutory grounds, and therefore the words of § 238 naturally enough were confined to what always is the first question in a case before them. The Supreme Court of the District of Columbia on the other hand is a court of general jurisdiction, and whether or not the clause of § 250 was suggested by the earlier one, we see no sufficient justification for denying to it the scope that it must have if it is given its natural sense. The plea to the jurisdiction raises the question clearly, and a certificate would add nothing to what the record shows.

We are not prepared to say that the judgment before us was not " otherwise reviewable " on the question of the boundary between the United States and Virginia, so far as the defendant drew in question the construction of the Revised Statutes relating to the District of Columbia, § 1, June 22, 1874, hereafter discussed. We should hesi-

tate to apply the decision in *American Security & Trust Co.* v. *District of Columbia,* 224 U. S. 491, to such a case.

The question of the jurisdiction of the trial Court and that of the merits very nearly coalesce, as the original title, at least, of Maryland and its jurisdiction were founded upon the same facts, and as the United States succeeded to the rights of Maryland by the grant of the District completed in 1791. That the original title of Maryland extended at least to low water mark on the Virginia side it now is too late to deny, in view of the decisions in *Maryland* v. *West Virginia,* 217 U. S. 1, 45, 46; s. c. *ibid.* 577, 578; and *Morris* v. *United States,* 174 U. S. 196. An attempt to throw doubt upon these authorities and upon the effect of the charter of Charles I, June 20, 1632, granting Maryland to Lord Baltimore (*ad ulteriorem dicti Fluminis Ripam et eam sequendo* &c., 217 U. S. 25) "to the farther bank of the said [Potomac] river and following it," by the charters of James I to Virginia and especially by the terms of a grant from the Governor of Virginia to Howsing in 1669 must fail. The latter grant is subordinate to the former and is not inconsistent with it as the language is "extending down Potomack River by various courses 3152 po. making a S. Wtly line to a pokecory" &c. The implication of the words "by various courses" that the grant follows the line of the stream is not changed by the words "including several small creeks or inlets." The land in question is situated upon an indentation, called Battery Cove, but the place is not a creek or inlet. The former decisions of the Court must be followed so far as they go.

The original state of things was not changed by the grant of Virginia and the regrant by the United States of the part of the District on the Virginia side. They at least did not enlarge the rights of that State. The compact between Virginia and Maryland in 1785 also seems to us to have no bearing upon the case. It says nothing

about the boundary in terms. Without going into the history of the compact or reciting it, we only need to remark that it was a regulation of commerce, and while with a view to opening up a route to the West it provided in Article 6 that the Potomac should be considered as a common highway for the purposes of navigation and commerce to the citizens of Virginia and Maryland, and in Article 7 gave the citizens of each State full property in the shores of the river adjoining their lands and the privilege of carrying out wharves, &c., with a common right of fishing, it left the question of boundary open to long continued disputes. It may be laid on one side even if it ever was in force in the District of Columbia, which has been denied on the ground that the compact was abrogated so far as it affected this land by the grant of Virginia and was not revived by the grant of the United States. *Evans* v. *United States,* 31 App. D. C. 544, 550. See *Georgetown* v. *Alexandria Canal Co.,* 12 Pet. 91.

The question of boundary remaining open was submitted to arbitration which ended in an award accepted by the parties in 1878. But that was an arbitration between the two States and did not purport to affect the boundary of the District. The assent of the United States did not enlarge its scope. Act of March 3, 1879, c. 196, 20 Stat. 481. It is said that as the submission was to an ascertainment of the true boundary line the award must be taken to have determined it, but the question was confined to the boundary between the States as they then were, and whatever may be the force of the argument that the same principle ought to govern here, it was not and could not be adjudicated. Further discussion on this point is not needed. The award fixed low water mark on the Virginia side as the boundary, and is only material if at all as suggesting a claim that the low water line should be drawn from headland to headland and in that

way include the indentation or cove where the United States has filled. But we know of no reason for construing the charter to Lord Baltimore as so limited or that to Howsing as importing such a rule.

.The only important aspect of the last.mentioned suggestion is in connection with a claim of prescriptive right. The land behind the filling of the United States is made land, and the fillings on the Alexandria side go below the original low water mark. In this case, however, there is no attempt to disturb the long maintained possession of such extensions whether originally warranted or not. The only question before us is of the rights of the United States to fill land that hitherto has been under water. The plaintiff in error seeks to exclude it by force of what already has been done and the claims of right that have been made in connection with it. If the taking possession of land were under a deed purporting to convey more than the portion actually occupied, no doubt, within reasonable limits, the sovereign power might give to it the effect of adverse possession of the whole, as against other subjects of the same power. *Montoya* v. *Gonzales,* 232 U. S. 375, 377, 378. But the effect of filling in upon the edge of a stream as against a different power is another matter. Such acts in themselves import no claim beyond the land thus occupied. Maryland and the United States are not called upon to scrutinize the discourse of those in Virginia even if in statutory form. Except so far as actually occupied the seizin of the land remains in the party that has the title. "One who enters upon the land of another, though under color of title, gives no notice to that other of any claim, except to the extent of his actual occupancy." *Hunnicutt* v. *Peyton,* 102 U. S. 333, 369. Still more is this true as against independent sovereign rights.

Finally, on the other hand, the Revised Statutes relating to the District of Columbia, June 22, 1874, § 1, de-

scribe the District as "including the river Potomac in its course through the District," which imports an asser-tion by Congress that the title of the United States em-braces the whole river bed; and the jurisdiction of the District over the river seems to have been exercised with-out dispute. For cases that have reached the reports see *Alexandria Canal Railroad & Bridge Co.* v. *District of Columbia,* 1 Mackey, 217, 225, 226. *Smoot* v. *District of Columbia,* 23 App. D. C. 266. *Evans* v. *United States,* 31 App. D. C. 544.

It may happen that such filling as is done in this case will interrupt previously existing access to the water front. But that does not affect the right of the United States to possession of the land. What other rights, if any, the plaintiff in error may have does not concern us now.

*Judgment affirmed.*