## WASHINGTON AIRPORT, Inc., v. SMOOT SAND & GRAVEL CORPORATION.

### No. 3026.

Circuit Court of Appeals, Fourth Circuit.

Oct. 21, 1930.

Louis Titus, of Washington, D. C. (C. Bascom Slemp, of Washington, D. C., on the brief), for appellant.

Luther B. Way, Sp. Asst. U. S. Atty., of Norfolk, Va., and J. P. Wenchel, Sp. Asst. to the U. S. Atty., of Washington, D. C. (Paul W. Kear, U. S. Atty., of Norfolk, Va., and Elton L. Marshall and Seth W. Richardson, both of Washington, D. C., and Gardner L. Boothe, of Alexandria, Va., on the brief), for appellee.

John R. Saunders, Atty. Gen., Edwin H. Gibson and Collins Denny, Jr., Asst. Attys. Gen., on the brief), as amici curiæ, for the Commonwealth of Virginia.

Before PARKER and NORTHCOTT, Circuit Judges, and ERNEST F. COCHRAN, District Judge.

**PARKER, Circuit Judge.**

■ This suit was instituted in the court below to enjoin alleged trespasses on land between high and low water mark on the Virginia side of the Potomac river opposite the District of Columbia. The learned District Judge, being of opinion that the boundary of Virginia extended only to high-water mark, dismissed the bill for lack of jurisdiction; and complainant has appealed. The sole question presented is whether the boundary line between Virginia and the District of Columbia is at high or at low water mark on the Virginia side of the Potomac.

On May 23, 1609, King James I of England granted to the commonwealth of Virginia a tract of land extending two hundred miles northward from Point Comfort. This, of course, embraced all of the Potomac river and much territory beyond. In 1632 King Charles I made a grant to Lord Baltimore, including substantially what is now the state of Maryland, the southern boundary of which was described in part as "to the farther bank of said river and following it." In 1688, King James II granted to Lord Culpeper what is now known as the Northern Neck of Virginia, including "the Potomac River and all the islands within the outermost banks thereof."

These conflicting grants led to considerable controversy, which the state of Virginia attempted to settle in her Constitution adopted June 29, 1776, wherein she surrendered her claim to the territory of Pennsylvania and Maryland, but asserted her right to the free navigation and use of the Potomac and Pocomoke rivers and to property in the Virginia shores and strands thereof, the particular provision being as follows:

"The territories, contained within the Charters, erecting the Colonies of Maryland, Pennsylvania, North and South Carolina, are hereby ceded, released, and forever confirmed, to the people of these Colonies respectively, with all the rights of property, jurisdiction and government, and all other rights whatsoever, which might, at any time heretofore, have been claimed by Virginia, except the free navigation and use of the rivers Patomaque and Pokomoke, *with the property of the Virginia shores and strands, bordering on either of the said rivers,* and all improvements, which have been, or shall be made thereon." (Italics ours.)

The Code of Virginia, in accordance with the claim in her Constitution, asserts jurisdiction over the Virginia shores and strands of the Potomac (see section 9 of Virginia Code 1919); and it is admitted that these terms include the lands between high and low water mark.

On March 28, 1785, a compact was entered into between commissioners appointed by the states of Maryland and Virginia, for the purpose of settling their rights and the rights of their citizens in the Potomac River and other waters, article 7 thereof (see Code Va. 1919, § 14) being as follows:

"Seventh, *The citizens of each State, respectively, shall have full property in the shores of Potowmack river adjoining their lands,* with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements, so as not to obstruct or injure the navigation of the river; but the right of fishing in the river shall be common to, and equally enjoyed by, the citizens of both States: Provided, that such common right be not exercised by the citizens of the one State to the hindrance or disturbance of the fisheries *on the shores of the other State;* and that the citizens of neither State shall have a right to fish with nets or seines *on the shores of the other."* (Italics ours.)

This compact was entered into after the states of Maryland and Virginia had acquired their independence and before the adoption of the Federal Constitution or the

formation of the District of Columbia. It will be noticed that it recognized the rights of property of the citizens of the respective states in the shores of the river adjoining their lands, and also that it recognized the "shores" of the river as belonging to the respective states and not to the state of Maryland alone. The proviso that the right of fishing should not be exercised by the citizens of one state to the disturbance of the fisheries "on the shores of the other state," and that the citizens of neither state should have a right to fish with nets or seines "on the shores of the other," was a clear recognition of the fact that the shores on the Virginia side of the river were under the jurisdiction of the state of Virginia. It would have been absurd to have confirmed the right of property in the Virginia shores to the citizens of Virginia and at the same time to have reserved to the state of Maryland political jurisdiction over those shores, so that controversies over titles thereto would be justiciable only in Maryland and crimes committed thereon punishable only in Maryland courts. The compact did not settle, or purport to settle, whether the line of Virginia followed the shore line of the river in case of indentations, bays, etc., or whether it extended from headland to headland, a question which later led to frequent disputes; but it unquestionably did settle the jurisdiction of that state and the rights of its citizens as extending to low-water mark on the river. As said by the Supreme Court in Maryland v. West Virginia, 217 U. S. 577, 580, 30 S. Ct. 630, 631, 54 L. Ed. 888:

"The compact of 1785 (see Code of Virginia, vol. 1, title 3, chap. 3, § 13, p. 16) is set up in this case, and its binding force is preserved in the draft of decrees submitted by counsel for both states. *We agree with the arbitrators in the opinion above expressed, that the privileges therein reserved respectively to the citizens of the two states on the shores of the Potomac are inconsistent with the claim that the Maryland boundary on the south side of the Potomac river shall extend to high-water mark.* There is no evidence that Maryland has claimed any right to make grants on that side of the river, and the privileges reserved to the citizens of the respective states in the compact of 1785, and its subsequent ratifications, indicate the intention of each state to maintain riparian rights and privileges to its citizens on their own side of the river." (Italics ours.)

That case, we think, is directly in point. There the line between Maryland and West Virginia was involved. West Virginia was claiming under Virginia, just as the rights of the District of Columbia here arise under grant from Maryland. After the rendition of the first opinion in that case, reported in 217 U. S. 1, 30 S. Ct. 268, 54 L. Ed. 645, a question arose as to whether the boundary of West Virginia extended to high or to low water mark on the Potomac. The Supreme Court held that it extended to low-water mark, basing its decision on the compact of 1785 and using the language which we have quoted above.

The decision of the Supreme Court in the Maryland-West Virginia Case was in no sense based upon the arbitration of 1877 between Maryland and Virginia, and could not have been based upon it, as West Virginia was not a part of Virginia at the time of that arbitration, and could not have been bound thereby. The Supreme Court did, however, consider the action of the arbitrators as persuasive authority on the question involved; and we think that it is likewise persuasive here, as the arbitrators had before them the very question which we are considering and were lawyers of great ability and distinction, one of them, Mr. Jeremiah S. Black, having been Attorney General of the United States. The Supreme Court quotes with approval the following pertinent passages from their report:

"The evidence is sufficient to show that Virginia, from the earliest period of her history, used the south bank of the Potomac as if the soil to low-water mark had been her own. She did not give this up by her Constitution of 1776, when she surrendered other claims within the charter limits of Maryland; but, on the contrary, she expressly reserved 'the property of the Virginia shores or strands bordering on either of said rivers (Potomac or Pocomoke) and all improvements which have or will be made thereon.' *By the compact of 1785, Maryland assented to this,* and declared that 'the citizens of each state respectively shall have full property on the shores of the Potomac, and adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements.' * * *

"Taking all together, we consider it established that *Virginia has a proprietary right on the south shore to low-water mark,* and, appurtenant thereto, has a privilege to erect any structures connected with the shore which may be necessary to the full enjoyment of her riparian ownership, and which

shall not impede the free navigation or other common use of the river as a public highway.

*"To that extent Virginia has shown her rights on the river so clearly as to make them indisputable."* (Italics ours.)

While we agree with the learned judge below that the arbitration of 1877 between Maryland and Virginia was not binding upon the District of Columbia or upon the United States as the sovereign power within the District, the opinion of the arbitrators as to the effect of the compact of 1785 is, of itself, entitled to great respect. As their opinion was adopted by the Supreme Court in the Maryland-West Virginia Case, it became authoritative as to the meaning of that document; and there can be no further question that the effect of the compact was to fix the boundary of Virginia at low-water mark on the river.

We come, then, to the question as to whether that boundary opposite the District of Columbia has been changed by subsequent events. We do not think that it has. In 1791, commissioners were appointed under act of Congress, who selected an area ten miles square to constitute the seat of government of the United States. The area so selected lay along the Potomac, partly in Maryland and partly in Virginia. Acts of both states were passed in that year, under which each ceded to the United States the land embraced within the area which lay within its boundaries. The effect of the act of Virginia was to vest in the United States jurisdiction over the part of the area which belonged to Virginia, i. e., the part of the ten-mile square area on the Virginia side, to low-water mark on the Potomac, as determined by the compact of 1785. By Act July 9, 1846 (9 Stat. 35), Congress passed an act ceding back to Virginia the territory which she had ceded to the United States, the language of the act being as follows:

"All of that portion of the District of Columbia ceded to the United States by the State of Virginia, and all the rights and jurisdiction therewith ceded over the same, be, and the same are hereby, ceded and forever relinquished to the State of Virginia, in full and absolute right and jurisdiction, as well of soil as of persons residing or to reside thereon." Section 1.

We do not follow the Court of Appeals of the District of Columbia in its position taken in the case of Evans v. United States, 31 App. D. C. 544, and Herald v. United States, 52 App. D. C. 147, 284 F. 927, to the effect that the compact of 1785 was abrogated by the cession of that portion of the District of Columbia originally granted by the state of Virginia and its recession by the United States. On the contrary, we think that the rights of the state of Virginia in the land in question, as determined by the compact of 1785, were ceded to the United States by the act of cession of 1791, and that exactly the same rights were ceded back to the state by the act of 1846. As said by Mr. Justice Holmes in the case of Marine Ry. v. U. S., 257 U. S. 47 at page 63, 42 S. Ct. 32, 34, 66 L. Ed. 124, "The original state of things was not changed by the grant of Virginia and the regrant by the United States of the part of the District on the Virginia side."

The decisions of the Court of Appeals to which we have referred are based, we think, upon a misconception of the case of Georgetown v. Alexandria Canal Company, 12 Pet. 91, 9 L. Ed. 1012, upon which the appellee relies. That was a suit instituted to enjoin the construction of an aqueduct over the Potomac river, on the ground that the piers of the aqueduct obstructed the free use of the river secured to the people living on its borders by the compact of 1785 between Virginia and Maryland. The court held that the citizens of the contracting states were not parties to that compact; that its stipulations would have been subject to change by the states which made it; and that, when they ceded to Congress the portion of their territory within the District of Columbia lying on both sides of the river, Congress could make any provision for building an aqueduct across the river within that territory that the states could have made by joint action if the territory had not been ceded. Nothing is said in the decision as to the effect of the compact as settling the boundary of Virginia at the low-water mark on the Potomac, nor was that question in any way involved. The fact that, by ceding the District of Columbia to the United States, Maryland and Virginia vested in the federal government all rights with respect to the use of the river reserved to themselves and their citizens by the compact of 1785, could have nothing to do with the question as to whether the boundary of the territory ceded by Virginia was fixed by the compact of 1785 at high or at low water mark, or as to whether the act of 1846, ceding the Virginia portion of the District back to Virginia, should be construed as having reference to the same boundary.

The case of Morris v. U. S., 174 U. S. 196, 19 S. Ct. 649, 43 L. Ed. 946, relied upon by

the appellee, is not in point. It is true that in that case it was stated that the grant to Lord Baltimore embraced the Potomac river to high-water mark on the Virginia shore; but the question as to whether the Virginia boundary was at high or low water mark, or how that question was affected by the compact of 1785, was not involved in the decision. The heirs of John and James Marshall were claiming lands on the northern, or District of Columbia, side of the river, under the grant of James II to Lord Culpeper, to which we have referred; and the court merely held that Lord Culpeper acquired no rights to the land there in controversy because of the prior grant to Lord Baltimore. Title or jurisdiction on the Virginia side of the river was in no way involved; and it is manifest that the decision could not be authority for the location of the Virginia boundary at high-water mark as distinguished from low-water mark on the Virginia side.

The case of Marine Ry. v. U. S., 257 U. S. 47, 42 S. Ct. 32, 33, 66 L. Ed. 124; Id. 49 App. D. C. 285, 265 F. 437, involved, not whether the boundary was at the high or at the low water mark, but whether it extended from headland to headland, so as to include within the boundaries of Virginia a strip of made land lying below the low-water mark within a cove or indentation on the Virginia side. The boundary of Virginia was not established as extending from headland to headland until the award of 1878 under the arbitration with the state of Maryland, which, being after the formation of the District of Columbia, did not, of course, affect its boundary. It was accordingly held that the land there in controversy was not within the boundaries of Virginia, as the original boundary of Maryland extended at least to low-water mark on the Virginia side, and that the courts of the District of Columbia had jurisdiction. On this question the court, speaking through Mr. Justice Holmes, said:

"Except an insignificant portion as to which no special defence was made and which it is agreed may be disregarded, this strip lay below low water mark until it was filled in by the United States in 1910–1912 by dredging from the bottom of the river and depositing the material on the other side of a rip-rap wall built on the river bed. * * * The question of the jurisdiction of the trial court and that of the merits very nearly coalesce, as the original title, at least, of Maryland and its jurisdiction were founded upon the same facts, and as the United States suc-

ceeded to the rights of Maryland by the grant of the District completed in 1791. That the original title of Maryland extended at least to low water mark on the Virginia side it now is too late to deny, in view of the decisions in Maryland v. West Virginia, 217 U. S. 1, 45, 46, 30 S. Ct. 268, 54 L. Ed. 645; Id., 217 U. S. 577, 578, 30 S. Ct. 630, 54 L. Ed. 888; and Morris v. United States, 174 U. S. 196, 19 S. Ct. 649, 43 L. Ed. 946. * * * The award (i. e., of 1878) fixed low water mark on the Virginia side as the boundary, and is only material if at all as suggesting a claim that the low water line should be drawn from headland to headland and in that way include the indentation or cove where the United States has filled. But we know of no reason for construing the charter to Lord Baltimore as so limited or that to Howsing as importing such a rule."

The soundness of the decision in Maryland v. West Virginia, supra, was nowhere questioned in the opinion in Marine Ry. v. U. S., supra. On the contrary, article 7 of the compact of 1785, upon which the decision in the former case was grounded, was referred to as giving "the citizens of each state full property in the shores of the river." And the Court of Appeals of the District, referring to that case in language which is conclusive of the point involved here, said:

"In the recent case of Maryland v. West Virginia, 217 U. S. 577, 30 S. Ct. 630, 54 L. Ed. 888, the court, considering the award of 1878, by which the boundary between the states of Maryland and Virginia was fixed at the low-water line on the Virginia shore, *held, in effect, that this line had been established by the compact of 1785.* The United States was not a party to the award of 1878, and her status with respect to the boundary between the District of Columbia and Virginia was not involved. However, as we interpret the opinion, *it holds that the boundary was established at low-water mark by the compact of 1785,* and, unless affected by the exercise of political jurisdiction by the United States, it likewise fixes the boundary of the District of Columbia as ceded by Maryland in 1789, four years after the compact, since whatever territory and right to the soil under the Potomac was ceded to the United States by Virginia in 1789 was receded in 1846." (Italics ours.) 49 App. D. C. 285, 265 F. 437, at page 441.

Our attention is particularly called by appellee to the following language of the Supreme Court in the Marine Railway Case:

"The compact between Virginia and Maryland in 1785 also seems to us to have no bearing upon the case. It says nothing about the boundary in terms. Without going into the history of the compact or reciting it, we only need to remark that it was a regulation of commerce, and while with a view to opening up a route to the West it provided in Article 6 that the Potomac should be considered as a common highway for the purposes of navigation and commerce to the citizens of Virginia and Maryland, and in Article 7 gave the citizens of each State full property in the shores of the river adjoining their lands and the privilege of carrying out wharves, etc., with a common right of fishing, it left the question of boundary open to long continued disputes. It may be laid on one side even if it ever was in force in the District of Columbia, which has been denied on the ground that the compact was abrogated so far as it affected this land by the grant of Virginia and was not revived by the grant of the United States. Evans v. United States, 31 App. D. C. 544, 550. See Georgetown v. Alexandria Canal Co., 12 Pet. 91, 9 L. Ed. 1012."

There is nothing in this, however, which in any way militates against the rule laid down in Maryland v. West Virginia, holding that the compact of 1785 fixed the Virginia boundary at low-water mark. As said by the Supreme Court, that compact had no bearing on the point involved in the Marine Railway Case, for the reason that it merely fixed the boundary at low-water mark, and did not determine the disputed question as to the boundary between headland and headland, which was among the long-continued disputes left open by the compact, to which the opinion referred. The query as to whether the compact was ever in force within the District manifestly refers to those of its provisions which were regulations of commerce, and which were before the court in the case of Georgetown v. Alexandria Canal Company, supra. We do not understand that this query was intended to draw in question again the point decided in Maryland v. West Virginia that the boundary of Virginia was fixed by the compact at low-water mark.

In holding that the boundary of Virginia extended only to high-water mark, and that the court was without jurisdiction of the controversy for that reason, the court below was in error, and the decree dismissing the bill will accordingly be reversed.

Reversed.